'08 CIV 5072

**THE SHAPIRO FIRM, LLP**
Robert J. Shapiro, Esq.
Jonathan S. Shapiro, Esq.
500 Fifth Avenue, 14th Floor
New York, New York 10110
Tel. (212) 391-6464

*Local Counsel for Plaintiff*

**SCHIFFRIN BARROWAY**
**TOPAZ & KESSLER, LLP**
Sean Handler, Esq.
Darren Check, Esq.
Stuart Berman, Esq.
Christopher Nelson, Esq.
280 King of Prussia Road
Radnor, PA 19087
Tel. (610) 667-7706

*Counsel for Plaintiff*



# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES CONNOLLY, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| | ) **Case No.** |
| Plaintiff, | ) ) |
| | ) |
| vs. | ) CLASS ACTION COMPLAINT |
| | ) |
| AMERICAN INTERNATIONAL GROUP, INC., MARTIN J. SULLIVAN, STEVEN J. BENSINGER, JOSEPH J. CASSANO, ROBERT E. LEWIS and DAVID L. HERZOG, | ) ) **JURY TRIAL DEMANDED** ) ) |
| | ) |
| Defendants. | ) ) |

Plaintiff, James Connolly ("Plaintiff"), alleges the following based upon the investigation

by Plaintiff's counsel, which included, among other things, a review of the defendants' public

documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding American International Group, Inc. ("AIG" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a federal class action on behalf of purchasers of AIG's securities between May 11, 2007 and May 9, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      AIG, a self-proclaimed world-leading insurance and financial services provider, is an international organization with operations in more than 130 countries and jurisdictions. Primarily, AIG companies serve commercial, institutional and individual customers through an extensive worldwide property-casualty and life insurance network.   In addition to insurance services, AIG companies are leading providers of retirement services, financial services and asset management around the world.  Through its various entities and divisions, including American General Finance ("AGF"), United Guaranty ("UGC") and AIG Financial Products ("AIGFP"), the Company is also active in most segments of the residential mortgage market.  For example, the Company originates mortgages through AGF, which extends first- and second- lien mortgages to borrowers, and it provides mortgage guaranty insurance through UGC for first- and second-lien mortgages that protect lenders against credit losses.

3.      Throughout the Class Period, defendants downplayed AIG's exposure to the losses tied to its credit default swap ("CDS") portfolio and to assets and products tied to residential

home mortgages. Additionally, the Company represented to investors time and time again that AIG had in place superior risk management strategies that would shield the Company from excessive risk exposure.

4.      The first true sign of weakness with the Company occurred on February 11, 2008, when AIG disclosed that it would give updated information regarding its credit swap portfolio losses. The Company announced that losses in this portfolio through November 30, 2007 were about $5.96 billion, as opposed to the $1.05 billion to $1.15 billion it had announced in December 2007. Further, the Company announced that it netted its losses in the credit swap portfolio against cash flow diversion features and negative basis adjustments. The Company had not used these features when determining the value of its credit swap portfolio for the third quarter 2007 because it decided that it could not estimate the value of the cash flow diversion features. The Company further admitted that it had used inadequate valuation models to determine its third quarter 2007 losses, and that it had been advised by its independent auditors, PricewaterhouseCoopers ("PWC") that it had a material weakness in its internal control over financial reporting and oversight related to its AIGFP super senior CDS portfolio.

5.      On this news, the Company's shares fell $5.94 per share, or 11.72 percent, to close on February 11, 2008 at $44.74 per share, on unusually heavy trading volume.

6.      Then, on February 28, 2008, in its report for Full Year 2007 and the fourth quarter 2007, the Company further revealed a quarterly loss of $5.3 billion (its largest quarterly loss in history) which was the result of an $11.5 billion drop in its credit swap portfolio. The Company acknowledged that the December 7, 2007 application of $3.63 billion in negative basis adjustments to reduce the reported decline in the value of its credit default swap portfolio was without basis. Moreover, the Company admitted that its credit default swap portfolio had $6.5

billion in liquidity puts written on subprime mortgage-related collateralized debt obligations ("CDOs"), and that the Company had repurchased $754 million of these securities in 2007, while at the same time providing $3 billion in liquidity to third parties. Finally, the Company acknowledged its agreement with PWC that the Company had deficient internal controls over the valuation and oversight of its credit swap portfolio.

7.    On this news, shares of the Company's stock again declined, finally closing on March 10, 2008 at $41.95 per share.

8.    The final kink in the Company's proverbial armor occurred on May 8, 2008, when the Company once again shocked investors when it announced its financial results for the first quarter 2008, stating that the Company incurred a net loss of $7.81 billion, or $3.09 per diluted share, for the quarter. Further, the Company announced a plan to raise $12.5 billion in capital through a common stock offering and an equity-linked offering.

9.    Upon the release of this news, the Company's shares declined $3.87 per share, or 8.77 percent, to close on May 9, 2008 at $40.28 per share, on unusually heavy trading volume. Due to the shocking news, the price of AIG shares continued to fall, finally closing on May 12, 2008 at $38.17 per share.

10.    The Complaint alleges that, throughout the Class Period, defendants failed to disclose material adverse facts about the Company's financial well-being, business relationships, and prospects. Specifically, defendants failed to disclose or indicate the following: (1) that the Company was not insulated from losses caused by the credit market meltdown, contrary to earlier statements; (2) that the assets underlying AIG's CDS portfolio had deteriorated drastically such that significant defaults were imminent; (3) that given this, the Company's CDS portfolio had suffered significant losses; (4) that the Company used inadequate valuation models to

calculate losses in its portfolios; (5) that the Company's financial statements were not prepared in accordance with Generally Accepted Accounting Principles ("GAAP"); (6) that the Company lacked adequate internal and financial controls; and (7) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

11.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

14.    Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this Judicial District.  Additionally, AIG's principal executive offices are located within this Judicial District.

15.    In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

16.    Plaintiff, James Connolly, as set forth in the accompanying certification, incorporated by reference herein, purchased AIG's securities at artificially inflated prices during the Class Period and has been damaged thereby.

17.    Defendant AIG is a Delaware corporation with its principal executive offices located at 70 Pine Street, New York, New York.

18.    Defendant Martin J. Sullivan ("Sullivan") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO).

19.    Defendant Steven J. Bensinger ("Bensinger") was, at all relevant times, the Company's Chief Financial Officer ("CFO") and Executive Vice President.

20.    Defendant Joseph J. Cassano ("Cassano") was, at all relevant times, head of AIGFP.

21.    Defendant Robert E. Lewis ("Lewis") was, at all relevant times, the Company's Chief Credit Officer and Senior Vice President.

22.    Defendant David L. Herzog ("Herzog") was, at relevant times, the Company's Comptroller and Senior Vice President.

23.    Defendants Sullivan, Bensinger, Cassano, Lewis and Herzog are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of AIG's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or

cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

### Background

24.    AIG, a self-proclaimed world-leading insurance and financial services provider, is an international organization with operations in more than 130 countries and jurisdictions. Primarily, AIG companies serve commercial, institutional and individual customers through an extensive worldwide property-casualty and life insurance network. In addition to insurance services, AIG companies are leading providers of retirement services, financial services and asset management around the world. Through its various entities and divisions, including American General Finance ("AGF"), United Guaranty ("UGC") and AIG Financial Products ("AIGFP"), the Company is also active in most segments of the residential mortgage market. For example, the Company originates mortgages through AGF, which extends first- and second- lien mortgages to borrowers, and it provides mortgage guaranty insurance through UGC for first- and second-lien mortgages that protect lenders against credit losses.

### Materially False and Misleading
### Statements Issued During the Class Period

25.    The Class Period begins on May 11, 2007. On May 10, 2007, after the market closed, the Company issued a press release entitled "AIG Reports First Quarter 2007 Results."

Therein, the Company reported its adjusted net income, which was said to exclude the effects of

FAS 133 losses of $205 million. The Company attributed the loss to changes in the value of its

economic hedges (as opposed to derivative securities portfolios, stating they represented "the

effect of hedging activities that did not qualify for hedge accounting treatment under FAS 133 or

for which hedge accounting was not applied, including the related foreign exchange gains and

losses. In the first quarter of 2007, AIG began applying hedge accounting for certain

transactions, primarily in its Capital Markets operations. Additionally, the Company, in relevant

part, stated:

> American International Group, Inc. (AIG) today reported that *its*
> ***net income for the first quarter of 2007 was $4.13 billion or $1.58***
> ***per diluted share, compared to $3.20 billion or $1.22 per diluted***
> ***share in the first quarter of 2006.*** Net income, as reported,
> includes the effect of economically effective hedging activities that
> did not qualify for hedge accounting treatment under FAS 133 or
> for which hedge accounting was not applied, including the related
> foreign exchange gains and losses. First quarter 2007 adjusted net
> income, as defined below, was $4.39 billion or $1.68 per diluted
> share, compared to $3.38 billion or $1.29 per diluted share for the
> first quarter of 2006. [Emphasis added]

26.     On or about May 10, 2007, the Company filed its second quarter 2007 financial

results with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Sullivan,

Bensinger and Herzog, and reaffirmed the Company's financial results announced in the May 10,

2007 press release.

27.     On August 8, 2007, the Company issued a press release entitled "AIG Reports

Second Quarter 2007 Results." Therein, the Company, in relevant part, stated:

> American International Group, Inc. (AIG) today reported that its
> net income for the second quarter of 2007 was $4.28 billion or
> $1.64 per diluted share, compared to $3.19 billion or $1.21 per
> diluted share in the second quarter of 2006. Net income, as
> reported, includes the effect of economically effective hedging
> activities that did not qualify for hedge accounting treatment under
> FAS 133, including the related foreign exchange gains and losses.

Second quarter 2007 adjusted net income, as defined below, was a record $4.63 billion or $1.77 per diluted share, compared to $4.16 billion or $1.58 per diluted share in the second quarter of 2006.

\*   \*   \*

Commenting on the second quarter's results, AIG President and Chief Executive Officer Martin J. Sullivan said, "Overall, AIG performed very well in the second quarter. Results were driven by solid growth in General Insurance, Life Insurance & Retirement Services, Asset Management and *Capital Markets*. Partnership returns remained strong, positively affecting investment income.

\*   \*   \*

"During the second quarter of 2007, AIG increased book value and generated an adjusted return on equity of 19.8 percent, while returning capital to shareholders through share repurchases and increased dividends. We remain focused on creating long-term opportunities to grow at attractive rates of return and, ultimately, driving even greater shareholder value.

*"We continue to be very comfortable with our exposure to the U.S. residential mortgage market, both in our operations and our investment activities. However, in recognition of the significant investor interest in this topic, we will provide a presentation during our earnings call,* which will be available in the investor information section of AIG's website tomorrow morning at 7:30 a.m." [Emphasis added.]

28.     Also on August 8, 2007, the Company filed its second quarter 2007 financial results with the SEC on Form 10-Q. The Company's 10-Q was signed by Defendants Sullivan, Bensinger and Herzog, and reaffirmed the Company's financial results announced that same day. Additionally, the Company's 10-Q, in relevant part, stated the following:

Since 1998, AIGFP has written super senior (AAA+) protection through credit default swaps, a portion of which is exposed to CDOs of residential mortgage-backed securities and other asset-backed securities. . . As of August 6, 2007, all of AIGFP's super senior exposures continued to have tranches below AIGFP's attachment point which have been explicitly rated AAA or would have been rated AAA had they been rated. *AIGFP's portfolio of credit default swaps is carefully structured, undergoes regular monitoring, modeling and analysis and contains significant*

*protection through collateral subordination.* In addition, in December 2005, AIGFP stopped committing to writing super senior protection for CDOs that included any subprime collateral. [Emphasis added.]

29.    The following day, on August 9, 2007, the Company held a conference call with

analysts and investors.   During the call, the following statements were made:

[Sullivan]: AIG-FP's exposure to the market is derived through two sources. First, they write extremely risk-remote super senior or AAA-plus credit protection on highly-diversified pools of assets, some of which include residential mortgages. Second, they are cash investors in highly-rated securities where some portion of the underlying collateral, which may include collateral from many sectors, includes residential mortgages.

*While both of these activities involve significant notional exposure, the risk actually undertaken is very modest and remote, and has been structured and managed effectively.*

AIG-FP has been running a successful business of writing super senior credit default swap, or CDS, protection since 1998. As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion. The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality. Before AIG-FP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.

\*       \*       \*

Temporary market disruptions may have some noneconomic effect on AIG through unrealized losses. However, the sound credit quality of the portfolios should result in collection of substantially all principal and interest under any reasonable scenario.

AIG's Financial Products portfolio of super senior credit default swaps is well structured; undergoes ongoing monitoring, modeling, and analysis; and enjoys significant protection from collateral subordination. Certainly, we will be following this market closely during this period of volatility and correction, and we will continue to manage these risks carefully.

\*       \*       \*

[Lewis]: AIG-FP has been running a successful business of writing super senior credit default swap, or CDS, protection since 1998. As of June 30 this year, they had a total net CDS exposure across all asset classes of $465 billion. The super senior portion is the least likely to incur any losses in these deals, since losses are allocated on a sequential basis from lowest to highest quality. Before AIG-FP would be at risk for its first dollar of loss, these structures would have to experience exceptional losses that eroded all of the tranches below the super senior level, including a very significant AAA layer of protection.

*　　*　　*

[Cassano]: It is hard to -- sometimes I feel like we -- it is hard to get this message across. But these are very much handpicked. We are very much involved in the process of developing the portfolios in which we are going to wrap, and then picking the attachment points. People have been willing to work with us in order to do that, to create the value that they do in these underlyings.

*So the combination of the diversity, the combination of the underlying credit quality, and then the stresses that we put it through -- to make sure that we can hit these marks -- it is hard for us with, and without being flippant, to even see a scenario within any kind of realm of reason that would see us losing $1 in any of those transactions.*

*　　*　　*

We wanted to make sure in this presentation, we broke out exactly what everything looked like in order to give everybody the full disclosure. *But we see no issues at all emerging. We see no dollar of loss associated with any of that business.*

Any reasonable scenario that anyone can draw -- and when I say reasonable, I mean a severe recession scenario that you can draw out for the life of those securities. [Emphasis added.]

30.　　On August 13, 2007, *The Wall Street Journal* published an article entitled "In Subprime, AIG Sees Small Risk; Others See More --- Insurer Bases Its Take On Valuation Models, But Analysts Find Fault." There article, in relevant part, revealed:

AIG might not want to whistle too loudly as it strolls past the subprime graveyard.

Exotic financial instruments linked to subprime mortgages are showing huge losses in debt markets and weighing on companies from lenders to banks to insurers. But not at American International Group Inc.--or so its executives say.

*The insurance giant did its best to reassure markets late last week that it wasn't going to get slammed by the crisis gripping mortgage and debt markets. Although AIG sees mortgage delinquencies rising, executives said during an earnings conference call that the bulk of its mortgage insurance and residential loans aren't at risk.*

The company also said it didn't see problems related to a kind of insurance contract, or derivative, it has written against financial instruments that include some subprime debt. AIG based its all-clear signal for those derivatives on the fact that its internal models show that losses are extremely remote in the portions of the investment vehicles it's insuring. No likely losses means no reason to worry, the company reasoned.

*Yet the company's valuation models seem to ignore the fact that those derivatives would likely take a haircut if sold in today's depressed market. "There's no way these aren't showing a loss,"* says Janet Tavakoli, president of Tavakoli Structured Finance Inc., a Chicago research firm. That's simply a market reality, she adds, that should be showing up in AIG's results.

AIG counters that it doesn't see any loss in the instruments' value because they are insuring portions of financial vehicles that can withstand losses even under severe recessionary conditions.

*"We disagree" with those questioning the company's valuation,* said Elias Habayeb, chief financial officer for AIG Financial Services, a division of the insurer. *"I believe we come up with our best estimate of the fair value [of these instruments] based on all the information available to us and that's reflected in our financial statements."*

Stock analysts seem satisfied by the company's response that there isn't a problem. That's even though plenty of other companies in recent months have made similar claims only to see them upended by unprecedented developments in mortgage markets. Analysts at Fox-Pitt, Kelton, for instance, said in a research note after AIG's

earnings that the instruments with subprime links were "the least likely to incur any losses in these deals."

*AIG's share price rose 37 cents to $64.67 in 4 p.m. composite trading Friday on the New York Stock Exchange. Amid the subprime carnage that has seen financial stocks get slammed, AIG stock has held up fairly well.*

Accounting experts don't fault AIG for using models to value the derivatives since there isn't a ready market for them. But they also say AIG's models need to take into account market conditions as well as investors' views of the value and risks associated with a type of product.

The conflict over a slice of AIG's books and subprime exposure underscores a bigger question facing investors: Are companies and investment funds realistically pricing hard-to-value securities, or are they basing values on in-house models that reflect wishful thinking?

That dilemma has taken on added urgency as investors try to figure out where mortgage losses may be lurking and as the Securities and Exchange Commission checks to see if big investment banks are appropriately valuing securities both on their own books and for their customers' accounts.

The issue goes to one of the most basic questions within financial markets: namely, how much is something worth? That is often a difficult question for companies and fund managers when pricing securities that they aren't actually selling.

Even more vexing: Many securities linked to mortgages and other kinds of debt don't trade in organized markets like a stock exchange, so prices aren't easily available. When markets turn sour, valuing such securities becomes harder because buyers may disappear.

*In AIG's case, the company says there isn't a market for the insurance contracts, or credit default swaps, in question because they are linked to particular pools of collateralized debt obligations, investment vehicles that package debt securities, often backed by mortgages. The insurer said in a presentation accompanying its results last week that of the $465 billion of such swaps it has written since 1998, about $64 billion is linked to multisector CDOs that contain a mixture of subprime debt.*

> *AIG said the portions of the CDOs with subprime exposure that the swaps are insuring are "super senior" to other slices of those investment vehicles and that there are substantial loss buffers. This means that in the event of defaults, holders of lower-ranked paper within the CDOs experience losses well before AIG.*
>
> Since the swaps are derivatives, AIG has to mark them to market in each reporting period and record any gains or loses in their value as a charge or boost to profit. The company says the value of the swaps on its books hasn't changed "significantly" since the first quarter, or before mortgage and debt markets tanked.
>
> AIG's Mr. Habayeb says the company records all its derivatives at fair, or market, values as per accounting rules. In the models it uses to derive this fair value, the company says it looks to the performance of the underlying assets, expected losses, credit ratings and interest rates as well as what's happening in the market.
>
> Ms. Tavakoli, the research-firm president, argues that the drastic change in mortgage markets since April should gain greater weight in those estimates of value. And that, she says, should result in AIG showing some loss on the derivatives.
>
> If that occurred, the loss would be taken as a charge to profit. The extent of any charge would be difficult to estimate. Even though it would likely be small compared to AIG's recent second-quarter net profit of nearly $4.3 billion, which was up 34% compared with the same period a year ago, it would let investors better gauge AIG's subprime-related risks. [Emphasis added.]

31.    On November 7, 2007, the Company issued a press release entitled "AIG Reports Third Quarter 2007 Results." Therein, the Company, in relevant part, stated:

> American International Group, Inc. (AIG) today reported that its net income for the third quarter of 2007 was $3.09 billion or $1.19 per diluted share, compared to $4.22 billion or $1.61 per diluted share in the third quarter of 2006. Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses.
>
> Third quarter 2007 adjusted net income, as defined below, was $3.49 billion or $1.35 per diluted share, compared to $4.02 billion or $1.53 per diluted share in the third quarter of 2006.

*Included in both third quarter and nine months 2007 net income and adjusted net income was a charge of approximately $352 million pretax ($229 million after tax) for a net unrealized market valuation loss related to AIG Financial Product Corp.'s (AIGFP) super senior credit default swap portfolio.* AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.

Net income for the first nine months of 2007 was $11.49 billion or $4.40 per diluted share, compared to $10.61 billion or $4.04 per diluted share in the first nine months of 2006. Adjusted net income for the first nine months of 2007 was $12.51 billion or $4.79 per diluted share, compared to $11.55 billion or $4.40 per diluted share in the first nine months of 2006.

*        *        *

*AIG estimates a further unrealized market valuation loss through October 2007 of approximately $550 million before tax for AIGFP's super senior credit default swap portfolio.* [Emphasis added.]

32.    Also on November 7, 2007, AIG filed its Quarterly Report with the SEC on Form 10-Q. The Company's 10-Q was signed by the Defendants Sullivan, Bensinger and Herzog, and reaffirmed the Company's financial results previously announced that same day.

33.    On November 8, 2007, the Company conducted a conference call with analysts and investors. During the call, the following statements were made:

[Lewis]: Turning to slide 40, AIG Financial Products exposure to the residential mortgage market continues to be derived through two sources. First, they are a writer of risk remote Super Senior credit protection on highly diversified tools of assets which include residential mortgages. Second, they are cash investors in high-grade securities where, while the collateral comes from many sectors, some of it does include residential mortgages.

*While both of these activities involve significant notional exposure, the ultimate credit risk actually undertaken is remote and has been structured and managed effectively. AIG Financial Products has been running a successful business and writing Super Senior protection since 1998.* The term Super Senior has been increasingly employed in the market over the recent few months, so it is important to understand that there is no one single

or uniform definition for this term or for the remoteness of credit risk to which it is applicable.

*    *    *

*AIG-FP maintains a regular program where it closely monitors and models each transaction in the portfolio. Despite recent rating action and dislocation in the marketplace, AIG-FP's analysis indicates that except for a very modest amount that is AAA risk their exposure remains Super Senior. We continue to believe strongly that AIG-FP will not be required to make any payments on these derivatives.* [Emphasis added.]

34.    On December 7, 2007, AIG filed a Form 8-K/A with the SEC, memorializing an investor meeting held on December 5, 2007.   While the Company stated that it experienced a decline in its CDS portfolio, the Company also assured investors that AIG's exposure to housing is "manageable" and that it had no exposure to structured investment vehicles.   The Form 8-K, in relevant part, stated:

### Disclosure at AIG Investor Meeting

On December 5, 2007, American International Group, Inc. (AIG) held an investor meeting to discuss its exposures to the U.S. residential mortgage market in greater detail. AIG provided this additional information about its results prior to its fourth quarter earnings announcement date in light of the extreme market conditions in the last two months. AIG expects that market conditions will continue to evolve, and that the fair value of AIG's positions, and its expectations with respect to its consumer finance and mortgage guaranty operations, will frequently change. Given these anticipated fluctuations, AIG does not intend to update any financial information until it announces its fourth quarter 2007 earnings. Investors also should not expect AIG to provide information about the results of future quarters in advance of scheduled quarterly earnings announcement dates.

*The effect on AIG's financial results for the fourth quarter from changes in the fair value of its super senior credit default swap portfolio and its investment portfolio, as well as the results from its consumer finance and mortgage guaranty operations, will depend on future market developments that are difficult to predict in this volatile market environment and could differ significantly from the amounts previously disclosed.* There are a

number of factors that could cause results to change over time, including further deterioration in the sub-prime mortgage market, further declines in home values and interest rate increases.

During its presentation, AIG provided updated information with respect to valuations of the super senior credit derivative portfolio of AIG Financial Products Corp. and AIG Trading Group Inc., including their respective subsidiaries (collectively, AIGFP) and AIG's Residential Mortgage-Backed Securities (RMBS) investment portfolio.

*AIG noted that the ongoing disruption in the structured finance markets and the recent downgrades by rating agencies continue to adversely affect AIG's estimates of the fair value of the super senior credit derivatives written by AIGFP. Although it remains difficult to estimate the fair value of these derivatives due to continuing limitations on the availability of market observable data, AIG's best estimate of the further decline in the fair value of AIGFP's super senior credit derivatives since October 31, 2007 is approximately $500 million to $600 million as of November 30, 2007, or an aggregate of approximately $1.05 billion to $1.15 billion since September 30, 2007.* The fair value of these derivatives is expected to fluctuate, perhaps materially, in response to changing market conditions, and AIG's estimates of the value of AIGFP's super senior credit derivative portfolio at future dates could therefore be materially different from current estimates. AIG continues to believe that it is highly unlikely that AIGFP will be required to make payments with respect to these derivatives.

During its presentation, AIG stated that a definitive estimate of the mark to market valuation of AIG's RMBS portfolio as of November 30, 2007 was not yet available, but AIG's preliminary estimate of the additional gross unrealized losses was approximately 2 percent for the month. AIG has obtained November 30 portfolio pricing information for over 90 percent of the RMBS portfolio and estimates that additional gross unrealized losses for that portion of the RMBS portfolio will be approximately 2.1 percent. If the balance of the RMBS portfolio were to sustain losses at the same rate as the portion of the portfolio for which AIG has obtained pricing information, AIG estimates that the additional unrealized losses for November would be approximately $1.9 billion and the aggregate change in unrealized losses for the RMBS portfolio for the first two months of the fourth quarter would be approximately $2.6 billion. There can be no assurance that the pricing information for the balance of the RMBS portfolio will be similar to that already received or will

not be adversely affected by subsequent developments. Therefore, the aggregate unrealized losses for the RMBS portfolio through November 30, 2007 could be materially different from AIG's current estimates.

Investments in RMBS held by AIG's insurance operations constituted approximately 10 percent of AIG's invested assets at both September 30, 2007 and November 30, 2007. During its presentation, AIG pointed out that AIG holds many other fixed maturity and equity securities whose valuation should be considered in assessing the effect of the valuation decrease in the RMBS portfolio on AIG's financial condition. The overall effect of changes in valuation of AIG's total fixed maturity and equity securities cannot currently be estimated, because the foregoing estimates with respect to the RMBS portfolio remain very preliminary and relate to only a small portion of the overall portfolio, do not include the positive or negative effect of changes in the valuation of non-U.S. assets (including the foreign exchange effect thereon), and do not include any changes for the month of December, which could be positive or negative depending on market changes during the month. [Emphasis added.]

35.    The statements contained in ¶¶ 25-29 and 31-34 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company was not insulated from losses caused by the credit market meltdown, contrary to earlier statements; (2) that the assets underlying AIG's CDS portfolio had deteriorated drastically such that significant defaults were imminent; (3) that given this, the Company's CDS portfolio had suffered significant losses; (4) that the Company used inadequate valuation models to calculate losses in its portfolios; (5) that the Company's financial statements were not prepared in accordance with GAAP; (6) that the Company lacked adequate internal and financial controls; and (7) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

## The Truth Begins to Emerge

36.    On February 11, 2008, the Company shocked investors when it filed a Form 8-K with the SEC. Therein, the Company disclosed that its gross cumulative decline in valuation for

its credit swap portfolio through November 30, 2007 was $5.964 billion and that its "negative

basis adjustments" in its credit swap portfolio were $3.63 billion.  Moreover, the Company, in

relevant part, revealed:

> In connection with the preparation of its 2007 financial reports,
> American International Group, Inc. ("AIG") has recently
> concluded that AIG should clarify and expand its prior disclosures
> relating to the methodology and data inputs used to determine the
> fair values of the super senior credit default swap portfolio in
> respect of multi-sector collateralized debt obligations ("CDOs") of
> AIG Financial Products Corp. and AIG Trading Group Inc.,
> including their respective subsidiaries (collectively, "AIGFP").
>
> *As disclosed in AIG's Quarterly Report on Form 10-Q for the
> quarter ended September 30, 2007 (the "Form 10-Q"), AIGFP
> values its super senior credit default swaps using internal
> methodologies that utilize available market observable
> information and incorporate management estimates and
> judgments when information is not available.* In doing so, it
> employs a modified Binomial Expansion Technique ("BET")
> model that currently utilizes, among other data inputs, market
> prices obtained from independent sources, from which it derives
> credit spreads for the securities constituting the collateral pools
> underlying the related CDOs. The modified BET model derives
> default probabilities and expected losses from market prices, not
> credit ratings. *The initial implementation of the BET model did
> not adequately quantify, and thus did not give effect to, the
> benefit of certain structural mitigants, such as triggers that
> accelerate amortization of the more senior CDO tranches.*
>
> *As disclosed in the Form 10-Q, AIG did not give effect to these
> structural mitigants ("cash flow diversion features") in
> determining the fair value of AIGFP's super senior credit default
> swap portfolio for the three months ended September 30, 2007.
> Similarly, these features were not taken into account in the
> estimate of the decline in fair value of the super senior credit
> default swap portfolio through October 31, 2007 that was also
> included in the Form 10-Q because AIG was not able to reliably
> estimate the value of these features at that time. Subsequent to
> the filing of the Form 10-Q, through development and use of a
> second implementation of the BET model using Monte Carlo
> simulation, AIGFP was able to reliably estimate the value of
> these features. Therefore, AIG gave effect to the benefit of these
> features in determining the cumulative decline in the fair value
> of AIGFP's super senior credit default swap portfolio for the*

*period from September 30, 2007 to November 30, 2007 that was disclosed in AIG's Current Report on Form 8-K/A, dated December 5, 2007 (the "Form 8-K/A") filed after AIG's December 5, 2007 Investor Conference.*

In addition, during AIG's December 5 Investor Conference, representatives of AIGFP indicated that the estimate of the decline in fair value of AIGFP's super senior credit default swap portfolio during November was then being determined on the basis of cash bond prices for securities in the underlying collateral pools, with valuation adjustments made not only for the cash flow diversion features referred to above but also for "negative basis", to reflect the amount attributable to the difference (the "spread differential") between spreads implied from cash CDO prices and credit spreads implied from the pricing of credit default swaps on the CDOs.

*    *    *

AIG has not yet determined the amount of the increase in the cumulative decline in fair value of AIGFP's super senior credit default swap portfolio to be included in its December 31, 2007 financial statements. AIG is still accumulating market data in order to update its valuation of the AIGFP super senior credit default swap portfolio. AIG currently expects that the adjustment for cash flow diversion features will be included in determining the fair value of AIGFP's super senior credit default swap portfolio at December 31, 2007. However, as a result of current difficult market conditions, AIG is not able to reliably quantify the differential between spreads implied from cash CDO prices and credit spreads implied from the pricing of credit default swaps on the CDOs, and therefore AIG will not include any adjustment to reflect the spread differential (negative basis adjustment) in determining the fair value of AIGFP's super senior credit default swap portfolio at December 31, 2007. The fair value of the super senior credit default swap portfolio for the year ended December 31, 2007 will reflect continuing refinements, if any, of AIG's valuation methodologies and additional market data.

*AIG has been advised by its independent auditors, PricewaterhouseCoopers LLC, that they have concluded that at December 31, 2007, AIG had a material weakness in its internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio. AIG's assessment of its internal controls relating to the fair value valuation of the AIGFP super senior credit default swap portfolio is ongoing, but AIG believes that it currently has in place the necessary compensating controls and procedures to*

> *appropriately determine the fair value of AIGFP's super senior*
> *credit default swap portfolio for purposes of AIG's year-end*
> *financial statements.* [Emphasis added.]

37.    On this news, the Company's shares fell $5.94 per share, or 11.72 percent, to close

on February 11, 2008 at $44.74 per share, on unusually heavy trading volume.

38.    Then on February 12, 2008, The Wall Street Journal published an article entitled

"AIG Is Forced To Write Down Mortgage Links --- 'Material Weakness' Found in Accounting;

Stock Hits 5-Year Low." The article, in relevant part, stated:

> American International Group Inc., which has struggled to recover
> from an accounting scandal, will be forced to write down the value
> of financial instruments tied to mortgages after its auditors said
> they had found "material weakness," in its accounting systems, a
> signal that accounting firms may get tough on already battered
> financial giants.
>
> *The finding by AIG's auditors, PricewaterhouseCoopers LLP,*
> *forced the big insurer to lower the value of insurance contracts it*
> *holds by an estimated $4.88 billion, before tax. Late last year,*
> *AIG went to great lengths to tell investors about the company's*
> *exposure to subprime mortgages and estimated its losses on those*
> *instruments would be much smaller, just above $1 billion for*
> *October and November.*
>
> The write-down is a blow to Chief Executive Martin Sullivan, who
> took over AIG from longtime leader Maurice R. "Hank" Greenberg
> amid an accounting scandal in 2005 and has fought to improve the
> company's disclosure and put to rest criticisms that AIG
> manipulated earnings.
>
> "I think that's going to give the market a fair amount of concern,"
> Andrew Kligerman, an analyst at UBS Securities LLC said of the
> auditors' finding.
>
> *Investors sold AIG's shares aggressively, sending them down*
> *$5.94, or 12%, to $44.74, a five-year low, and below its nadir*
> *during its accounting scandal. The decline wiped out $15 billion*
> *in stock market value and was the biggest percentage drop for*
> *AIG's shares since the 1987 stock-market crash. AIG's shares*
> *have lost a third of their value in the past year and are down 23%*
> *this year. Bond-rating firm Fitch Ratings announced yesterday*
> *that it is putting AIG's issuer default rating on "negative" watch.*

"AIG had made significant strides in putting the accounting and regulatory issues of the Greenberg years behind it," GimmeCredit analyst Kathleen Shanley said in a report yesterday. "But the latest disclosures about a 'material weakness' in the internal controls related to the company's credit default swap portfolio undermines credibility with investors."

*       *       *

The move by PricewaterhouseCoopers comes as auditors are poring over the year-end financial statements of hundreds of companies that hold securities tied to mortgages. Already, firms have announced more than $100 billion in mortgage-related write-downs, and investors fear many more are still to come.

"It will be interesting to see if there will be similar material weaknesses cited for other latecomers to the write down game," said Mark Cheffers, chief executive of Audit Analytics, a research firm that tracks financial reporting errors.

*PricewaterhouseCoopers's finding that there was a material weakness in the internal controls used to value the insurance contracts is one of the first of its kind involving a major company since the financial crisis erupted last August,* said Mr. Cheffers. He added that more such findings could come as auditors go through year-end numbers, which are more closely scrutinized than quarterly figures.

*For AIG, having an auditor say it had weak internal controls was a serious blow.* The company had long been considered too complex and opaque for investors to thoroughly analyze. To own the stock, investors essentially had to take the company at its word that its accounting systems were solid. Other big financial companies such as Freddie Mac and Fannie Mae haven't recovered from the exposure of their accounting systems as flawed.

AIG said in an SEC filing disclosing the auditor's finding that its "assessment of its internal controls" related to valuing the portfolio "is ongoing," but said it believes that it now has the "necessary compensating controls and procedures to appropriately determine the fair value" of the portfolio for its year-end financial results.

*At issue was the way AIG valued credit default swaps, which are contracts that insure against default of certain securities. In valuing those swaps, AIG had benefited from what it assumed were differences in value of the swaps and the securities they were insuring. Now, its auditor has found the material weakness*

*in the way the firm valued the swaps; AIG says it won't rely on the gains from such differences because market conditions have grown so murky.*

AIG was put in this awkward position because it had disclosed the value of these holdings during investor updates at the end of last year. Those updates covered only the first two months of the fourth quarter, meaning additional write-downs could come when AIG includes December, when values of these securities fell further. AIG has until Feb. 29 to file its annual report.

AIG said in its SEC filing that it took the action in part because of "current difficult market conditions" and that it wouldn't use that method to report its year-end financial results.

The accounting firm's actions are in line with a push by auditors to force companies to use market values for securities they hold even if there is little trading going on. That, some observers believe, has accelerated the pace of write-downs in recent months.

The practice is also at odds with executives who say they believe that it would be better to look to the long-term value of securities rather than at distressed prices being thrown out by markets that in many cases have ceased functioning.

Not everyone gives the auditors, or even PricewaterhouseCoopers in this case, such high marks, though. The finding of a material weakness by PricewaterhouseCoopers, was "absolutely" a step in the right direction, said Janet Tavakoli, president of Tavakoli Structured Finance Inc., a Chicago research firm. But she said that disclosures were still insufficient in regard to the way AIG and others are coming up with values for such complex securities. [Emphasis added.]

39.     On February 28, 2008, the Company issued a press release entitled "AIG Reports

Full Year and Fourth Quarter 2007 Results." Therein, the Company, in relevant part, stated:

*American International Group, Inc. (AIG) today reported that its net income for full year 2007 was $6.20 billion or $2.39 per diluted share, compared to $14.05 billion or $5.36 per diluted share for full year 2006.* Net income, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133, including the related foreign exchange gains and losses. Full year 2007 adjusted net income, as shown below, was $9.31 billion or $3.58

per diluted share, compared to $15.41 billion or $5.88 per diluted share for full year 2006.

*The net loss for the fourth quarter of 2007 was $5.29 billion or $2.08 per diluted share, compared to net income of $3.44 billion or $1.31 per diluted share for the fourth quarter of 2006. The adjusted net loss for the fourth quarter of 2007 was $3.20 billion or $1.25 per diluted share, compared to adjusted net income of $3.85 billion or $1.47 per diluted share for the fourth quarter of 2006.*

*Included in both the full year and fourth quarter 2007 net income (loss) and adjusted net income (loss) were charges of approximately $11.47 billion pretax ($7.46 billion after tax) and $11.12 billion pretax ($7.23 billion after tax), respectively, for a net unrealized market valuation loss related to the AIG Financial Products Corp.(AIGFP) super senior credit default swap portfolio.* AIG continues to believe that the unrealized market valuation losses on this super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time. Under the terms of these credit derivatives, losses to AIG would result from the credit impairment of any bonds AIG would acquire in satisfying its swap obligations. Based upon its most current analyses, AIG believes that any credit impairment losses realized over time by AIGFP will not be material to AIG's consolidated financial condition, although it is possible that realized losses could be material to AIG's consolidated results of operations for an individual reporting period. Except to the extent of any such realized credit impairment losses, AIG expects AIGFP's unrealized market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio.

Fourth quarter 2007 results included pretax net realized capital losses of $2.63 billion ($1.71 billion after tax) primarily from other-than-temporary impairment charges in AIG's investment portfolio, with an additional $643 million pretax other-than-temporary impairment charge ($418 million after tax) related to AIGFP's available for sale investment securities. This compares to pretax net realized capital gains of $238 million ($121 million after tax) in the fourth quarter of 2006. The 2007 other-than-temporary impairment charges resulted primarily from the significant, rapid declines in market values of certain residential mortgage backed securities in the fourth quarter for which AIG cannot reasonably determine that the recovery period will be temporary.

\*        \*        \*

At December 31, 2007, AIG's consolidated assets were $1.061 trillion and shareholders' equity was $95.80 billion. *Shareholders' equity declined from September 30, 2007 due to the fourth quarter 2007 net loss and an additional $2.54 billion in after-tax unrealized depreciation of investments reported in other comprehensive income.* Book value per share at December 31, 2007 was $37.87, including a reduction of $0.36 per share related to payments of $912 million advanced to repurchase shares. A significant portion of the decrease in shareholders' equity during 2007 was the result of share purchases, substantially all of which were funded from the issuance of hybrid debt securities. These transactions replaced high cost common stock with cost efficient hybrid securities, a substantial portion of which is treated as equity capital by the rating agencies.

During the fourth quarter of 2007, AIG repurchased 21,257,364 shares of its common stock, bringing the total to 76,361,209 shares repurchased for full year 2007. An additional 12,196,187 shares were purchased through February 15, 2008, for a total of 88,557,396 shares purchased since March 2007. AIG does not expect to purchase additional shares for the foreseeable future, other than to meet commitments that existed at December 31, 2007.

Commenting on full year and fourth quarter 2007 results, AIG President and Chief Executive Officer Martin J. Sullivan said, *"AIG's results in 2007 were clearly unsatisfactory. This was a challenging year in which the deterioration of both the U.S. residential mortgage and credit markets significantly affected several of our operations and investments. Following record performance through the first six months of 2007, AIG experienced deteriorating results in its Mortgage Guaranty and Consumer Finance businesses, unrealized market valuation losses related to the AIGFP super senior credit default swap portfolio, and increased markdowns and impairments in our investment portfolios in the second half of the year, primarily in the fourth quarter.*

"Despite our reported results, a number of areas within AIG's diversified portfolio of global businesses performed well in the quarter. The underwriting results of the Domestic Brokerage Group and Foreign General were excellent. Aircraft Leasing and Institutional Asset Management reported strong operating income growth. The underlying performance of our Life Insurance & Retirement Services businesses provided further evidence that our continued focus on multiple distribution initiatives to capitalize on our broad product portfolio is gaining traction. Operating income

growth in this segment, however, was affected by unusual items in 2007 and 2006, as well as by market volatility.

*"During 2008, we expect the U.S. housing market to remain weak and credit market uncertainty will likely persist. Continuing market deterioration would cause AIG to report additional unrealized market valuation losses and impairment charges. However, with a diverse portfolio of global businesses, a strong capital base and outstanding talent, AIG has the ability to absorb the current volatility while committing the resources to grow and take advantage of opportunities. We continue to invest in improvements in internal controls, processes, systems and overall effectiveness and will continue to assign the highest priority to remediation efforts over our material weakness in internal control and oversight over the fair value valuation of AIGFP's super senior credit default swap portfolio. At the same time, we are looking to better leverage our significant scale, promote efficiency and improve margins. We are confident AIG is pursuing the right strategies, and has the global franchise and financial strength to meet our performance goals and build long-term shareholder value."* [Emphasis added.]

40.    Also on February 28, 2008, the Company filed its 2007 Annual Report with the SEC on Form 10-K.   The Company's 10-K was signed by Defendants Sullivan and Bensinger, and reaffirmed the Company's financial results announced that same day.    Additionally, the Company's 10-K, in relevant part, further revealed:

*During 2007, AIGFP repurchased securities with a principal amount of approximately $754 million pursuant to these obligations. In certain transactions, AIGFP has contracted with third parties to provide liquidity for the securities if they are put to AIGFP for up to a three-year period. Such liquidity facilities totaled approximately $3 billion at December 31, 2007. As of February 26, 2008, AIGFP has not utilized these liquidity facilities. At December 31, 2007, AIGFP had approximately $6.5 billion of notional exposure on 2a-7 Puts, included as part of the multi-sector CDO portfolio discussed herein.*

\*      \*      \*

**Report of Independent Registered Public Accounting Firm**

To the Board of Directors and Shareholders of American International Group, Inc.:

In our opinion, the consolidated financial statements listed in the accompanying index present fairly, in all material respects, the financial position of American International Group, Inc. and its subsidiaries (AIG) at December 31, 2007 and 2006, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2007 in conformity with accounting principles generally accepted in the United States of America. In addition, in our opinion, the financial statement schedules listed in the accompanying index present fairly, in all material respects, the information set forth therein when read in conjunction with the related consolidated financial statements. *Also in our opinion, AIG did not maintain, in all material respects, effective internal control over financial reporting as of December 31, 2007,* based on criteria established in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) *because a material weakness in internal control over financial reporting related to the AIGFP super senior credit default swap portfolio valuation process and oversight thereof existed as of that date.* A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis. The material weakness referred to above is described in Management's Report on Internal Control Over Financial Reporting appearing under Item 9A. We considered this material weakness in determining the nature, timing, and extent of audit tests applied in our audit of the 2007 consolidated financial statements, and our opinion regarding the effectiveness of AIG's internal control over financial reporting does not affect our opinion on those consolidated financial statements. AIG's management is responsible for these financial statements and financial statement schedules, for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in management's report referred to above. Our responsibility is to express opinions on these financial statements, on the financial statement schedules, and on AIG's internal control over financial reporting based on our integrated audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement and whether effective internal control over financial reporting was maintained in all material respects. Our audits of the financial statements included

examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation.

Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

*      *      *

*A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.* A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

PricewaterhouseCoopers LLP

*      *      *

*During the evaluation of disclosure controls and procedures as of December 31, 2007 conducted during the preparation of AIG's financial statements to be included in this Annual Report on Form 10-K, a material weakness in internal control over financial reporting relating to the fair value valuation of the AIGFP super senior credit default swap portfolio was identified. As a result of this material weakness, described more fully below, AIG's Chief Executive Officer and Chief Financial Officer concluded that, as of December 31, 2007, AIG's disclosure controls and procedures were ineffective.*

*    *    *

Management of AIG is responsible for establishing and maintaining adequate internal control over financial reporting. AIG's internal control over financial reporting is a process, under the supervision of AIG's Chief Executive Officer and Chief Financial Officer, *designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of AIG's financial statements for external purposes in accordance with GAAP.*

*    *    *

As of December 31, 2007, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not effective. *AIG had insufficient resources to design and carry out effective controls to prevent or detect errors and to determine appropriate disclosures on a timely basis with respect to the processes and models introduced in the fourth quarter of 2007.* As a result, AIG had not fully developed its controls to assess, on a timely basis, the relevance to its valuation of all third party information. *Also, controls to permit the appropriate oversight and monitoring of the AIGFP super senior credit default swap portfolio valuation process, including timely sharing of information at the appropriate levels of the organization, did not operate effectively. As a result, controls over the AIGFP super senior credit default swap portfolio valuation process and oversight thereof were not adequate to prevent or detect misstatements in the accuracy of management's fair value estimates and disclosures on a timely basis, resulting in adjustments for purposes of AIG's December 31, 2007 consolidated financial statements. In addition, this deficiency could result in a misstatement in management's fair value estimates or disclosures that could be material to AIG's annual or interim consolidated financial statements that would not be prevented or detected on a timely basis.* [Emphasis added.]

41.    Then, on February 29, 2008, the Company conducted a conference call with analysts and investors.   During the call, the following statements were made:

> [Sullivan]: *In many respects, we are in unchartered waters. In this context, let me make a few observations. The mark we reported this quarter essentially values the super senior notes net of the benefit from the cash flow diversion features built into these transactions rather than the value of the credit derivatives that AIGFP has written to protect these notes.* This is clearly not representative of the risk AIGFP holds on the super senior credit default swap transactions, but we could not find observable data points in this highly disrupted and illiquid market to value the protection we provide.
>
> *This business was carefully underwritten and structured using models to ensure that attachment points would withstand highly-stressed economic conditions. We continue to believe, however, that the unrealized market valuation losses on the super senior credit default swap portfolio are not indicative of the losses AIGFP may realize over time.*
>
> Under the terms of these credit derivatives, losses to AIG would result from the credit impairment of any bonds AIG would acquire in satisfying its swap obligations. Based upon our most current analysis, we believe that any credit impairment losses realized over time by AIGFP would not be material to AIG's consolidated financial condition. Although it is possible that they could be material to results of operations for an individual reporting period.
>
> Except to the extent of any such realized credit impairment losses, AIG expects AIG's FP unrealized market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio. My colleagues will speak to the valuation methodologies in further details in just a few minutes. [Emphasis added.]

42.    Following he Company's press release, 10-K and conference call, the Company's shares steadily fell over the course of several days, closing on March 10, 2008 at $41.95 per share.

**The Truth Emerges**

43.    Finally, on May 8, 2008, after the market closed, the Company issued a press release entitled "AIG Reports First Quarter 2008 Results."    Therein, the Company, in relevant part, stated:

> *American International Group, Inc. (AIG) today reported that the continuation of the weak U.S. housing market, the disruption in the credit markets, as well as equity market volatility, had a substantial adverse effect on its results for the first quarter ended March 31, 2008. These factors were primarily responsible for AIG incurring a net loss for the first quarter of 2008 of $7.81 billion or $3.09 per diluted share.* The net loss, as reported, includes the effect of economically effective hedging activities that did not qualify for hedge accounting treatment under FAS 133 or for which hedge accounting was not applied, including the related foreign exchange gains and losses. For the 2007 first quarter, in which none of these external conditions existed in a material fashion, AIG reported net income of $4.13 billion or $1.58 per diluted share. *First quarter 2008 adjusted net loss, as defined below, was $3.56 billion or $1.41 per diluted share, compared to adjusted net income of $4.39 billion or $1.68 per diluted share for the first quarter of 2007.*
>
> AIG emphasized that despite the difficult environment and its resulting effect on AIG's overall financial performance for the first quarter, core insurance businesses continue to perform satisfactorily. AIG is confident that, although present economic conditions are difficult, AIG's unmatched competitive advantages, strong brand, and unmatched global franchise position it extremely well for the future.
>
> *AIG also today announced a plan to raise approximately $12.5 billion in capital to fortify its balance sheet and provide increased financial flexibility. The capital is to be raised through a common stock offering and an equity-linked offering for an aggregate of approximately $7.5 billion.* At a later date AIG also expects to issue high equity content fixed income securities. These offerings are designed to further strengthen AIG's significant financial resources and will enhance its ability to grow while maintaining the strength to withstand potential short-term market volatility.
>
> *              *              *

Commenting on first quarter 2008 results, AIG President and Chief Executive Officer Martin J. Sullivan said, *"AIG's results do not reflect the underlying strengths and potential of AIG; rather they reflect the extremely adverse external conditions affecting the spectrum of companies exposed to the U.S. residential housing, credit and capital markets. The sizable unrealized losses and decline in partnership income were among the key drivers impairing our overall net performance.* With that said, it is important to underscore that our operating strategies are working well in our core insurance businesses. We believe that our businesses provide an attractive foundation for growth for AIG over the long-term. As part of this effort, we are taking appropriate strategic actions to ensure our businesses are well positioned to capitalize on opportunities provided by the current environment.

*"While we anticipated a difficult trading environment, the severity of the unrealized valuation losses and decline in value of our investments were beyond our expectations. Current market conditions also contributed to a significant decline in partnership income compared to a record level in the first quarter of 2007, as well as to declines in mutual fund income.* However, the underlying fundamentals of our core businesses remain solid, and several performed quite well in the quarter, despite the challenging environment many faced. Top line production was very strong in many of our businesses including Foreign General, Foreign Life and ILFC. Operations facing competitive market challenges, such as Commercial Insurance and Domestic Life Insurance, are maintaining their focus on profitable growth.

"Despite the challenges of today's markets, our talented and dedicated employees remain focused on serving our clients and executing our global growth strategies. We have established, well run businesses in our chosen markets around the globe and are confident we have the right strategies and resources to succeed. With the support of the newly added capital, we have every confidence in our ability to respond to today's market conditions and opportunities that may arise." [Emphasis added.]

44.    On this news, the Company's shares fell $3.87 per share, or 8.77 percent, to close on May 9, 2008 at $40.28 per share, on unusually heavy trading volume. Due to the shocking news, the price of AIG shares continued to fall, finally closing on May 12, 2008 at $38.17 per share.

45.     On May 20, 2008, the Company raised over $20 billion in new capital (less than two weeks earlier, it had announced plans to raise $12.5 billion).   The funds were meant to protect AIG from future losses related to residential mortgage exposure.

## AIG'S VIOLATION OF GAAP RULES
## IN ITS FINANCIAL STATEMENTS
## FILED WITH THE SEC

46.     These financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues, in violation of GAAP rules.

47.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. § 210.4 01(a) (1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

48.     Given these accounting irregularities, the Company announced financial results that were in violation of GAAP and the following principles:

>        (a)     The principle that "interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements" was violated (APB No. 28, ¶10);

(b)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(c)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(e)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(f)    The principle that "financial reporting should be reliable in that it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)    The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(h)    The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

49.    The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

50.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased AIG's securities between May 11, 2007 and May 9, 2008 inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

51.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AIG's securities were actively traded on the New York Stock Exchange ("NYSE"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AIG or, its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

52.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

53.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

54.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

      (a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

      (b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of AIG; and

      (c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

55.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

56.    The market for AIG's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, AIG's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired AIG's securities relying upon the integrity of the market price of AIG's securities and market information relating to AIG, and have been damaged thereby.

57.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of AIG's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

58.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about AIG's financial well-being and prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of AIG and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members

of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

59.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

60.    During the Class Period, Plaintiff and the Class purchased AIG's securities at artificially inflated prices and were damaged thereby. The price of AIG's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

61.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their receipt of information reflecting the true facts regarding AIG, their control over, and/or receipt and/or modification of AIG's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning AIG, participated in the fraudulent scheme alleged herein.

62.    Throughout the Class Period, the defendants took advantage of the artificially inflated price of the Company's securities in completing numerous financing activities. For

example, throughout the Class Period the Company completed numerous debt offerings which generated proceeds of over $6.3 billion

      63.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold shares of the Company's stock for gross proceeds of over $2.2 million.

**Applicability of Presumption of Reliance:**
**Fraud On The Market Doctrine**

      64.     At all relevant times, the market for AIG's securities was an efficient market for the following reasons, among others:

      (a)     AIG's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

      (b)     As a regulated issuer, AIG filed periodic public reports with the SEC and the NYSE;

      (c)     AIG regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      (d)     AIG was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

65.    As a result of the foregoing, the market for AIG's securities promptly digested current information regarding AIG from all publicly-available sources and reflected such information in the price of AIG's securities.  Under these circumstances, all purchasers of AIG's securities during the Class Period suffered similar injury through their purchase of AIG's securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

66.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of AIG who knew that those statements were false when made.

## FIRST CLAIM
### Violation of Section 10(b) of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

67.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.     During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase AIG's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

69.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for AIG's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.   All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

70.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about AIG's financial well-being and prospects, as specified herein.

71.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of AIG's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about AIG and its business operations and

future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AIG's securities during the Class Period.

72.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

73.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing AIG's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by defendants' overstatements and misstatements of the Company's financial well-being and

prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

74.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of AIG's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of AIG's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, Plaintiff and the other members of the Class acquired AIG's securities during the Class Period at artificially high prices and were damaged thereby.

75.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that AIG was experiencing, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their AIG securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

76.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

78.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

79.    The Individual Defendants acted as controlling persons of AIG within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

80.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

81.    As set forth above, AIG and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  New York, New York
       June 3, 2008

Respectfully submitted,

THE SHAPIRO FIRM, LLP

By: _____
Robert J. Shapiro, Esq.
Jonathan S. Shapiro, Esq.
500 Fifth Avenue, 14th Floor
New York, New York 10110
Tel. (212) 391-6464

*Local Counsel for Plaintiff*

**SCHIFFRIN BARROWAY
TOPAZ & KESSLER, LLP**
Sean Handler
Darren Check
Stuart Berman
Christopher Nelson
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

*Counsel for Plaintiff*

### CERTIFICATION

I, James H. Connolly, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.    Plaintiff has reviewed the Complaint, and authorizes its filing.

2.    Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff's purchase and sale transaction(s) in the American International Group Inc. (NYSE: AIG) security that is the subject of this action during the Class Period is/are as follows:

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common | 1,000 | B | | 10/29/2007 | $82.16 |
| | | | | | |
| | | | | | |
| | | | | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5.    Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.    During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30 day of May, 2008

JAMES H. CONNOLLY